OPINION OF THE COURT
Arthur J. Doran, J.
On September 17, 1986, defendant William Schaefer was charged by Yonkers Detective Robert Hunt in a felony complaint with assault in the second degree under section 120.05 (2) of the Penal Law. It was alleged at that time that the defendant had recklessly caused serious physical injury to *555 Demetrick Spears, age 3, by operating a motor vehicle with .10 of 1% by weight of alcohol in his blood, and at such an excessive and unsafe rate of speed that adequate braking was impossible, causing the vehicle to strike and injure said infant. Sometime following the lodging of the complaint the youngster died of his injuries.
The question of criminal responsibility for the tragedy of Demetrick’s death has been disposed of by the Westchester Grand Jury. This court has but one issue to decide and one issue only, to wit: Did the People prove, beyond a reasonable doubt, that on or about September 17, 1986, William Schaefer operated a motor vehicle while he had .10 of 1% or more of alcohol in his blood as shown by chemical analysis of his breath?
We deal here with a charge which pertains only to blood alcohol level, without regard to the effect the alcohol may have on the driver. Accordingly, it has been determined that driving while impaired (Vehicle and Traffic Law § 1192 [1]) is not a lesser included offense of Vehicle and Traffic Law § 1192 (2) (People v Brown, 53 NY2d 979 [1981]).
In this case, the breathalyzer test was the sole evidence utilized to attempt to prove the defendant’s guilt. Defendant’s sole challenge to the breathalyzer test result was the accuracy and reliability of the machine.
While the breathalyzer has gained universal acceptance, such proof of its scientific integrity need not be proven each time test results are offered into evidence, such results may, of course, be attacked on the ground that the proper operating procedures were not followed, or that the particular machine was not operating properly. (People v Gower, 42 NY2d 117; People v English, 103 AD2d 979.)
The court has made a thorough search for, and has been unable to find, any other reported case in New York State which dealt with a breathalyzer reading of precisely .10. This is the lowest possible reading one must have in his system in order to be convicted of the crime charged. If the machine is susceptible to the slightest error, the benefit of the error must inure to the defendant. If there is the slightest possibility of human error in the operation of the instrument, that error must inure to the benefit of the defendant.
Some help on this issue is gleaned from the case of People v Hellwig (22 Misc 2d 286 [I960]). There the defendant has been convicted of drunk driving when he had .16 by weight in his *556 blood. In 1960, the then permissible minimum for a prima facie case was .15. The court found that defendant staggered, his speech was slightly incoherent and there was an odor of alcohol on his breath. But the court also found that defendant, before the accident, operated his car safely through congested traffic. It also found that he had an arthritic condition which may have accounted for his unsteady walk and that he chewed tobacco and presented a somewhat unkempt appearance. Reviewing all these facts the County Court, sitting as an appeals court, stated: "Since the blood test showed a content so close to the minimal of the range above stated [i.e., .16 versus .15] the benefit of the doubt is accorded the defendant herein” (at 287). Accordingly, the court reversed the conviction.
THE DEFENDANT’S ALCOHOL CONSUMPTION
There is no question that the defendant had consumed some alcohol before the tragic occurrence. Gordon Scofield, a friend and co-worker of defendant, testified that defendant joined him at Kenny’s Cafe after work at about 5:45 p.m. on the day in question. They left the cafe at about 7:30 p.m. to go to defendant’s home to watch the Met’s game on television. Scofield testified that defendant had 2 to 4 beers while at the cafe. Whether these were bottles, glasses or cans of beer was not explored.
Detective Robert Hunt spoke to defendant at the scene of the accident. While soliciting the information from defendant as to how the accident happened the defendant, among other things, stated that he had had four beers. The detective detected a "slight odor of alcoholic beverage” on defendant’s breath. With this admission and observation, the detective immediately terminated the conversation and issued defendant the requisite Miranda warnings, whereupon defendant again stated that he and his friend had a few beers. Under cross-examination, the detective admitted that defendant did not exhibit the usual indicators of intoxication, i.e., slurred speech, glassy eyes, unsteadiness on his feet, etc. Except for the "slight odor of alcoholic beverage” the defendant appeared fine in all respects, the witness stated.
Sergeant Sullivan, the breathalyzer operator, was present at the scene when defendant was given his Miranda warnings. He recalls defendant saying that he had 3 or 4 beers with his friend before the accident.
*557 The court is, therefore, satisfied that defendant consumed some alcohol shortly before he was asked to take the breathalyzer test.
THE TEST
The breathalyzer test was administered by Sergeant Sullivan who was certified as of October 1985 to do such tests. He testified that he had conducted 3 to 4 dozen such tests in the past. After following the checklist procedure, he testified, the reading on the machine was .10. Detective Hunt, who was present during this procedure, also observed the .10 reading.
During cross-examination, Sergeant Sullivan admitted that there is a human element in the operation of the machine and acknowledged the possibility of human error. For instance, he said it was possible that the "nullmeter” could be set slightly off center, and that in "eyeing” the miniscus in the test ampoule it would be difficult to say whether the level was exactly l/16th inch above the ampoule gouge, as is required for an accurate test result. He also stated that the machine is always "on.”
THE MACHINE
It appears from defendant’s exhibit A that the machine, a Smith and Wesson Model 900A, was calibrated in Albany on August 14, 1985, at which time technician Hess found the instrument to be "filthy, acid stained, abused”. To repair the machine, the following was done: "Tightened all lamp sockets, replaced top header tubing, sleeve gasket, breath tube, cleaned piston and cylinder, replaced half nut and upper support shaft”. The equilibrator test record shows that the machine had then been in use through February 3, 1986, sent to Albany on March 19, 1986, and returned to Yonkers on April 24, 1986, after being calibrated. People’s 11 in evidence shows that technician Porter, on April 21, 1986, found the'condition of the instrument to be "OK” but found "slippage”. To repair this required an adjustment to the "half-nut”.
The machine remained continuously in use from April 25th through October 5th. Defendant had been tested just 18 days prior, i.e., September 17th. The record shows that the machine was sent to Albany on October 14, 1986, and examined by technician Hess on November 3rd. His statement of machine condition was: "Poor, filthy, acid stained, collection system corroded”. Repairs made were: "Replaced nullmeter, photo *558 cells, top and. bottom contact springs, bottom header, top header, tubing sleeve, gasket, relay, photometer bulb”. After repairs, the machine was calibrated. There was no proof offered as to the accuracy of the machine when it arrived in Albany and prior to this calibration.
THE EXPERT
The defendant called Mr. Richard Sperl as an expert witness to show that the machine was not in working order on the day defendant was given his breath test.
Mr. Sperl is unquestionably qualified as an expert and is obviously in full command of his subject matter.
Having reviewed the records of the machine in question, Mr. Sperl rendered his opinion that the .10 reading on the night defendant was tested was "not a true reading” and that the reading, in fact, was high. His opinion is based primarily on the poor condition of the machine, and to some extent, the mixture of the chemicals used, particularly where the test result is .10 precisely. In addition, he testified that the manufacturer of the 900A suggests an error factor in the machine of .001, plus or minus.
Based upon his experience, he opined that the fact that the machine had to be rebuilt twice in a period of slightly more than one year indicates that the machine had been abused, and the reading could not possibly be true. In his opinion, the internal damage found by technician Hess was the result of acid dripping into the compartment. This results from the mishandling of the test ampoule, which must be opened, and permitting some of that fluid to escape from its container, dripping into the machine. Thus, it is not surprising that technician Hess reported in August 1985 that the machine was "filthy, acid stained, abused”. Of greater significance was Hess’ report of November 3, 1986, that the machine was "poor, filthy, acid stained, collection system corroded”. This was only a short time after defendant’s test reading of .10, and constitutes strong evidence that the certification of the machine some seven months earlier was no longer reliable at the time this test was given.
Additionally, Sergeant Sullivan testified that the machine is always left "on”. Mr. Sperl stated that the machine was designed to be turned "off”. If left on he stated the heat generated thereby will cause a deterioration of some of the internal parts. In People v Todd (79 Misc 2d 630, 633, revd on *559 other grounds 38 NY2d 755) the court found that: "the machine had not been calibrated for more than six months and further that the machine was constantly left on at the troop barracks and never turned off. These two factors taken together raise a reasonable doubt * * * as to the reliability of that particular machine.”
The reported condition of the machine is such that no reasonable person could give it any credence whatsoever. In the condition that the machine was reported to be in, it is doubtful that its reliability could be useful in a DWI prosecution with readings of .15 or .20, much less for a reading of .10. This is not the quality of evidence necessary to support a criminal conviction.
Further, when these machines are sent to Albany for calibration, no information is provided with respect to accuracy of the machine before the calibration is done and before repairs are made. It seems to this court that a statement of accuracy of the machine prior to repair and calibration would be relevant to the issue of past accuracy. The fact that it was sent to Albany, repaired and calibrated is of no help at all retroactively. It can help prospectively, but only if the next time it is sent to Albany technicians state the accuracy upon arrival, not after repairs and calibration.
CONCLUSION
Where the only charge alleged is a violation of Vehicle and Traffic Law § 1192 (2) and the purported reading is .10 of 1%, reasonable doubt exists when:
1. The defendant exhibits none of the other usual indicators of intoxication (i.e., slurred speech, glassy or watery eyes, unsteadiness on feet, etc.);
2. An expert testifies, without rebuttal, that the machine has an error factor of plus or minus .001%;
3. The machine’s accuracy is not established prior to a repair and recalibration following defendant’s arrest;
4. The machine is in such a state of disrepair shortly after defendant’s arrest, such that it requires a massive overhaul;
5. When the machine is constantly left on and never turned off;
6. The operator of the machine acknowledges the possibility of human error in setting the nullmeter and/or eyeing the miniscus of the test ampoules.
*560 Any one of the above is alone sufficient to establish reasonable doubt. Taken in combination, there is no doubt in this court’s mind that the guilt of the defendant has not been proven.
Accordingly, the defendant is found not guilty.
[Portions of opinion omitted for purposes of publication.]